1  CHRISTOPHER WIMMER (SBN 263275)
   EMERGENT LEGAL
2  25 Taylor Street
   San Francisco, CA 94102
3  p: 415/894-9284
   f: 415/276-8929
4  e: cwimmer@emergentlegal.com
                        3:14-cv-1785
5  GREG DEMIRCHYAN (SBN 264953)
   BASIS LAW
6  25 Taylor Street
   San Francisco, CA 94102
7  p: 415/340-2121
   f: 415/840-8171
8  e: greg@basislaw.com

9  Attorneys for Plaintiffs ESTHER ESTRADA,
   ISAAC CARRAZCO, MARIA JACOBO, and all
10 others similarly situated

11

12                UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15 ESTHER ESTRADA, ISAAC CARRAZCO, and MARIA JACOBO, individually and on 16 behalf of all others similarly situated, | Case No.   3:14-cv-1785 |
| 17         Plaintiffs, | **CLASS ACTION COMPLAINT** |
| 18 v. | **DEMAND FOR JURY TRIAL** |
| 19 CLEANNET USA, INC.; D&G ENTERPRISES, INC., dba CLEANNET OF 20 THE BAY AREA; CLEANNET OF SAN JOSE; CLEANNET OF SOUTHERN 21 CALIFORNIA, INC.; CLEANNET OF SAN DIEGO; CLEANNET OF SACRAMENTO; 22 MARK SALEK; and MARK CRUM; | |
| 23         Defendants. | |

24

25

26

27

28

EMERGENT
LEGAL

**INTRODUCTION**

1.       CleanNet, a janitorial franchising company that operates through a sprawl of corporate entities and fictitious business names throughout California and the United States, is running a massive scam built on a series of illusions.

2.       CleanNet sells the illusion of independent business ownership, supported by a national enterprise, and the opportunity to grow that business through diligent labor.  The reality is that CleanNet decides which customers a franchise will get, the terms of a franchise's customer contracts, how much the franchise gets paid, and when and how the franchise will do the work— making the franchisees actually employees of CleanNet, but without CleanNet meeting any of its obligations as an employer.

3.       CleanNet sells the illusion that it will provide its franchises with an initial set of customer accounts, and may offer them additional accounts.  The reality is that CleanNet commits only to providing accounts for an initial 6-month period, pervasively fails to meet even this meager commitment, and then systematically takes customer accounts away from existing franchises in order to sell them to new franchises.

4.       CleanNet sells the illusion that franchises develop relationships directly with their customers.  The reality is that CleanNet, not the franchises, contracts with the customers, and that CleanNet does not share the terms of those contracts with its franchises—allowing CleanNet to charge the customers far more than it actually passes through to the franchises doing the work, and to assign (and re-assign) those customer accounts to whichever franchise it chooses.

5.       CleanNet sells the illusion that the various fees and charges it imposes on its franchises are necessary to cover the operating costs of the business.  The reality is that these fees and charges are disproportionate to any cost borne by CleanNet or benefit provided to the franchises.

6.       CleanNet sells the illusion that unhappy franchises have the opportunity to receive a refund of their investment.  The reality is that the refund and dispute resolution provisions of the franchise agreement that franchises must sign deny them any effective remedy.

1.

7.      CleanNet is able to perpetuate these illusions for one simple reason:  It has failed to comply with California's franchise registration and disclosure laws, making it impossible for potential franchise purchasers to understand the risks of their investment before they make it, and making every single sale of a CleanNet franchise in California unlawful.

8.      Esther Estrada, Isaac Carrazco, and Maria Jacobo—on behalf of themselves and all others similarly situated—now bring suit to remedy CleanNet's statewide, systematic misconduct.

## FACTUAL BACKGROUND

### A.    CLEANNET SELLS THOUSANDS OF FRANCHISES ACROSS THE STATE AND NATIONWIDE

9.      CleanNet was founded in the late 1980s by defendant Mark Salek ("Salek"), who remains President and Director of the enterprise to this day.  CleanNet is a multitier, unified operation.  Defendant CleanNet USA, Inc. ("CleanNet USA") sets national standards and policies for franchise agreements, franchise fees, branding, equipment, supplies, and cleaning services, and sells area operator franchises ("Area Operators").

10.     Area Operators, in turn, market and sell local unit franchises ("Local Franchises"). In California, CleanNet has five Area Operators—defendants D&G Enterprises, Inc. (doing business as CleanNet of the Bay Area), CleanNet of San Jose, CleanNet of Sacramento, CleanNet of San Diego, and CleanNet of Southern California, Inc.

11.     Local Franchises are the only entities that actually provide CleanNet's janitorial services to its thousands of commercial customers, including offices, schools, health care facilities, banks, airports, and industrial sites.

12.     Each tier of this operation is closely controlled by the tiers above it.  CleanNet USA exercises significant control over Area Operators' business, setting standards, providing them with operating manuals and periodic training, setting sample pricing for customer accounts, negotiating for competitive rates from cleaning supply companies, and providing Area Operators with the sales materials, disclosure documents, and franchise agreements that Area Operators use to sell Local Franchises.

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

13.     CleanNet USA and Area Operators, in turn, market CleanNet's services to potential customers, provide Local Franchises with their customer accounts, and set pricing and schedules for those accounts.  It is also CleanNet USA or the Area Operators that choose which customer accounts to assign to which Local Franchises.

14.     CleanNet as a whole has been phenomenally successful.  According to Entrepreneur magazine, between 2010 and 2012, CleanNet was one of the top ten fastest growing franchisors in the nation; in 2013, CleanNet reported 2,857 franchises nationwide.  As described below, however, that growth has benefited CleanNet USA and the Area Operators, and come at the expense of its Local Franchises.

**B.     CLEANNET OFFERS FRANCHISES WITHOUT MAKING REQUIRED DISCLOSURES AND BY MEANS OF UNTRUE AND MISLEADING STATEMENTS AND OMISSIONS**

15.     Franchising can provide lower- and middle-income families the opportunity to open and operate their own businesses without a significant capital investment.  However, depending on the structure, past performance, and management of the enterprise, and the terms of the franchise investment, franchises can be extremely risky—and potentially even deliberately rigged—ventures.

16.     Complaints of fraud and widespread abuse in the sale of franchises prompted California to pass the Franchise Investment Law (the "Franchise Law"), a first-of-its-kind legislation that focused on the need for registration and disclosure as a way to protect franchise investors.  The landmark statute requires sellers of a franchise to register the franchise before the offer of sale within the state and to deliver disclosure documents to prospective buyers prior to the execution of a franchise agreement.  CleanNet has done neither.

17.     First, CleanNet has failed to register with the state.  CleanNet's Area Operators are by definition "franchisors," and are thus required to register separately and individually with the state.  With only one exception, however, none of CleanNet's five Area Operators has ever registered with the state as a franchise seller (or obtained an exemption from registration).  And,

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

1   with that same one exception, none of CleanNet's Area Operators has ever renewed its

2   registration.

3        18.     One Area Operator, CleanNet of Southern California, has registered and renewed

4   with the state.  However, its registration and disclosure documents are materially inadequate and

5   fail to comply with the Franchise Law guidelines; among other things, they do not provide the

6   Area Operator's financial statements, making it impossible for potential purchasers to understand

7   the health of the Area Operator or its ability to supply customer contracts.

8        19.     Because it is unlawful to offer or sell any franchise in California unless the offer of

9   the franchise has been registered or exempted, every single franchise sale made by CleanNet and

10  its Area Operators from the time CleanNet entered California to the present has been unlawful.

11       20.     Second, CleanNet has failed to provide required disclosures.  The Franchise Law

12  requires that, at least 14 days before potential purchasers pay any money or sign any agreement,

13  franchisors must provide them with a detailed franchise disclosure document.  This document

14  must include information about the structure of the franchisor's operations; its business

15  experience; past litigation; initial and subsequent fees; initial investment; any restrictions on the

16  sources of products and services used by franchises; the franchisee's and franchisor's obligations;

17  financing of the franchise purchase; the franchise territory; intellectual property claimed by the

18  franchisor; the extent of the franchisee's obligation to participate in the actual operation of the

19  franchise business; any restrictions on what the franchise may sell; renewal, termination, transfer,

20  and dispute resolution provisions; any public figures who promote the franchises; any earnings

21  claims made by the franchisor; a list of outlets selling franchises; financial statements; franchise

22  contracts; and an acknowledgement of receipt of the disclosure document.

23       21.     Because four of CleanNet's five Area Operators has never registered any disclosure

24  documents with the state, and because CleanNet of Southern California's disclosure documents

25  are materially deficient, CleanNet cannot possibly comply with these disclosure obligations.  And,

26  while CleanNet did provide some potential purchasers with documents purporting to be

27  disclosures, it systematically violated the 14-day waiting period by insisting that franchisees make

28

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

their purchase only a few days after receiving these documents. In at least some cases, CleanNet went so far as to create backdated paperwork that made it seem as though it had complied with the waiting period.

**C.   CLEANNET SELLS MORE FRANCHISES THAN IT CAN SUPPORT AND TERMINATES LOCAL FRANCHISES' CUSTOMER ACCOUNTS WITHOUT CAUSE AND ON FALSE PRETENSES**

22.   What purchasers think they are getting when they invest in a CleanNet Local Franchise is a long-term partnership with an established brand of janitorial service, a set of customer accounts, advertising and marketing by the enterprise, and an established back office to handle customer invoicing, collections, and complaints. In reality, buying a Local Franchise does not guarantee customer accounts or help in finding new accounts, and CleanNet's structure encourages Area Operators to focus their attention on selling new Local Franchises rather than supporting existing Local Franchises. CleanNet has taken full advantage of this structure by selling more Local Franchises than it can support, and terminating Local Franchises' customer accounts without cause and on false pretenses—so that it can sell even more Local Franchises to unwitting purchasers.

23.   The reasons for this situation are structural, and have to do with how CleanNet USA sells franchises in California. As of 2003, when CleanNet last updated its disclosure documents with the State, Area Operators paid to CleanNet USA an initial fee between $100,000 and $250,000, and then invested another $118,000 to $327,000 to open their doors.

24.   Local Franchises, in turn, pay Area Operators an initial franchise fee of between $3,000 and $83,000, based on the total amount of customer accounts they wish CleanNet to supply to them. For example, to earn $1,000 per month gross from customer accounts, a Local Franchise pays the Area Operator a $5,800 initial franchise fee; to earn $4,000 per month gross, a $16,500 initial franchise fee; to earn $6,000 per month gross, a $21,500 initial franchise fee.

25.   In order just to recover their initial investment, then, Area Operators must sell a significant number of Local Franchises. For example, an Area Operator who paid the $250,000 initial franchise fee to CleanNet USA, and invested another $325,000 to get up and running (as

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

CleanNet USA estimated back in 2003) would have to sell more than 100 of the $4,000-per-month Local Franchise packages just to recover its initial outlays—to say nothing of the ongoing costs of operating the business such as rent, marketing, insurance, and other basic overhead.  CleanNet USA creates further pressure on Area Operators by collecting a 4% royalty fee on each sale of a Local Franchise; by charging a minimum royalty fee regardless of the number of Local Franchises sold; and by requiring Area Operators to meet minimum sales targets for Local Franchises, or risk losing their Area Operator business and their substantial investment.

26.     While Area Operators thus have ample incentive to sell as many Local Franchises as possible, neither their contracts with CleanNet USA nor their franchise agreements with the Local Franchises require that Area Operators actually have the janitorial customers to keep their Local Franchises in business.  To the contrary, Area Operators expressly contract with CleanNet USA not to make any representations to potential purchasers of Local Franchises about earnings or sales projections.  To make matters worse, neither CleanNet USA (in its contracts with its Area Operators) nor the Area Operators (in the franchise agreements with the Local Franchises) make any promise to advertise or market CleanNet's services to customers—meaning that Local Franchises have absolutely no guarantee that anyone in the CleanNet enterprise is working to promote their business.  Local Franchises do not even receive an exclusive territory—meaning that Area Operators can sell an unlimited number of Local Franchises in the same geographic area without regard to how many customers they can supply.

27.     Even the customer accounts that Local Franchises do receive are temporary and tenuous.  The franchise agreements promise Local Franchises only an initial customer base, not a long-term supply of customers; and make no promise that Area Operators will replace customer accounts terminated after 180 days, or to replace accounts terminated due to the Local Franchise's supposed "faulty workmanship," "lack of trustworthiness," "poor quality of work performed," or such other default.  Because Area Operators, rather than Local Franchises, handle all customer interactions (including invoicing, collecting, and fielding complaints), only Area Operators, not

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

1   Local Franchises, know for certain what a customer's complaints were—or even whether the

2   customer actually complained at all.

3       28.     CleanNet has taken full advantage of its enterprise structure to sell empty promises

4   to purchasers of Local Franchises.  After executing their franchise agreement and making their

5   initial investment, Local Franchises discover that CleanNet cannot provide them with their

6   guaranteed level of janitorial customer accounts.  They also find that their customer accounts are

7   transferred to other CleanNet Local Franchises, sometimes without notice.  When they inquire

8   about the reasons for the transfers, they are told that the customer has complained about their

9   workmanship or trustworthiness—even though the Local Franchises have never been told of a

10  problem, and even though they have adhered to CleanNet's cleaning standards.  Once they have

11  passed the initial 180-day window, CleanNet often dispenses with any excuse at all; the customer

12  accounts are simply reassigned, and Local Franchises are told that the franchise agreement they

13  signed guaranteed them nothing more.

14      29.     CleanNet's financial statements confirm this pattern.  Over the past four years, even

15  as CleanNet has continued to sell new Local Franchises throughout the state—requiring it to

16  increase its customer base if it is to satisfy the needs of all those Franchises—its revenues from

17  janitorial services, when adjusted for inflation, have been stagnant.

18      30.     In this way, responding to the structural incentives that CleanNet USA has devised,

19  Area Operators continually sell new Local Franchises, temporarily assign customer accounts to

20  those purchasers, and then reassign those accounts to still newer purchasers—each time around,

21  generating new revenues for themselves out of the same limited number of customer accounts,

22  without meeting their commitments to its Local Franchises.

23  **D.    CLEANNET SKIMS CONTRACT PROFITS AND CHARGES LOCAL
            FRANCHISES UNCONSCONSCIONABLE FEES**

24

25      31.     CleanNet also uses its control of the customer relationships to skim contract profits

26  that ought to go to Local Franchises and charge unconscionable fees that bear no reasonable

27

28

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

1  relationship to the actual costs of the services it provides or benefits it confers on its Local

2  Franchises.

3       32.  <u>Profit Skimming</u>.  CleanNet negotiates contract prices directly with its customers.

4  Local Franchises are not involved at all in the negotiations, and are not provided with copies of the

5  executed contracts, even though those customers theoretically "belong" to the Local Franchise.

6  Instead, the Local Franchises receive only "outlines" describing the work they are to do.  As a

7  result, Local Franchises are completely ignorant of the terms of those contracts.  CleanNet has

8  taken advantage of this structure by paying its Local Franchises significantly less than it is

9  charging its customers—in at least some cases, Local Franchises receive as little as a third of the

10 actual contract price.

11      33.  <u>Royalty Fee</u>.  CleanNet charges each Local Franchise a 3% monthly royalty fee on

12 all money earned by the Local Franchise—in essence, an ongoing fee on top of the initial

13 franchise fee just for doing business under CleanNet's name.

14      34.  <u>Administrative Fee</u>.  CleanNet charges each Local Franchise a 10% monthly

15 administrative fee on all money earned by the Local Franchise.  In theory, this fee covers the costs

16 of invoicing customers and managing customer relationships.  In reality, this fee far outstrips the

17 actual administrative costs incurred by CleanNet or the costs its Local Franchises would incur to

18 handle these same tasks.

19      35.  <u>Royalty and Administrative Fees on Isolated Services</u>.  At times, a customer will

20 request that a service be performed only occasionally (for example, changing light bulbs, washing

21 windows, or shampooing carpets).  On those services, CleanNet charges the Local Franchise a

22 royalty fee of 10% and an administrative fee of 10%.

23      36.  The royalty and administrative fees alone thus total between 13% and 20% of the

24 Local Franchise's gross monthly billings—meaning, for example, that a Local Franchise grossing

25 $4,000 per month in customer accounts receives from CleanNet only between $3,200 and $3,480.

26      37.  <u>Finder's Fee</u>.  As noted above, CleanNet commits to provide Local Franchises with

27 an initial customer base for 180 days, but does not commit to expand a Local Franchise's accounts

28

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

beyond that initial base, and does not commit to ensure those initial accounts remain with the Local Franchise beyond the 180-day window.  When it elects to provide a Local Franchise with additional accounts, though, it charges a staggering 2.75 times the monthly billings for that customer as a finder's fee.  For example, an additional account of $500 per month would cost a Local Franchise $1,375 up front (along with the 13% to 20% in monthly royalty and administrative fees), even though CleanNet would control the relationship with that customer and could, as it has systematically done, reassign that customer to some other Local Franchise at any time.

38.    <u>Miscellaneous Fees</u>.  On occasion, CleanNet also charges supply replacement fees, technology fees, advertising fees, and key return fees for services it provides at its own discretion, and at unreasonably high rates.

39.    In the aggregate, this profit-skimming and these royalties and fees leave Local Franchises with a mere fraction of the revenue they generate for CleanNet, making it impossible for many of them to sustain their business and driving many of them to abandon their franchises altogether after a short time—freeing up customer accounts for CleanNet to recycle once again.

**E.    CLEANNET'S FRANCHISE AGREEMENT UNCONSCIONABLY LIMITS LOCAL FRANCHISES' REMEDIES**

40.    When a Local Franchise owner grows tired of CleanNet's failure to provide the customer accounts it promised, CleanNet's reassignment of the Local Franchise's existing customer accounts without cause, and CleanNet's continued imposition of unconscionably high fees, he finds that the franchise agreement provides him with no effective remedy.

41.    The most common and most significant breach by CleanNet is its failure to provide the initial customer accounts that are the heart of the franchise agreement:  A Local Franchise purchases pays a $16,500 initial franchise fee for a $4,000-per-month package, for example, and never receives $4,000 per month in customer accounts.  In this situation, the franchise agreement sets several unconscionable barriers to recovery of any refund by the Local Franchise.

9.

42.   <u>Narrow Refund Window</u>.  In language buried in dense, confusing paragraphs, the franchise agreement creates a very narrow window within which the Local Franchise must complain to CleanNet about its failure to meet its obligations.  CleanNet has 120 days within which to provide the initial set of customer accounts.  If CleanNet fails to do so, the Local Franchise has a 10-day window within which to serve a written notice by hand delivery, overnight courier, or certified mail on the Area Operator and tender all equipment and chemicals received from CleanNet.  If the Local Franchise misses this narrow window, CleanNet receives an additional 60 days to provide the customer accounts.  If CleanNet fails a second time, the Local Franchise has an additional 10-day window to serve notice and tender its materials.  If the Local Franchise misses this window again, CleanNet receives an additional 60 days.  And so on. Throughout this period, CleanNet will be collecting interest on any promissory note, as well as royalty and administrative fees on any customer accounts it has provided.  Nothing in the franchise agreement purports to require CleanNet to even inform the Local Franchise that this window exists, or that the Local Franchise is missing it.

43.   <u>Strict Limit on Refunds</u>.  The franchise agreement strictly limits the amount of refunds CleanNet will provide.  If an Area Operator offers even a single customer account of any size anywhere within the territory, the Local Franchise may only recover a fraction of its initial investment.  Specifically, the Local Franchise is limited to 80% of the percentage of the account shortfall, multiplied by the initial franchise fee, less the interest the Local Franchise has accrued on its promissory note.  For example, if a Local Franchise purchased the $4,000-per-month package and paid the entire $16,500 initial franchise fee up front, and CleanNet offered a single customer of $500 per month for even a single month, the most that Local Franchise could recover in refunds would be $11,550.

44.   <u>Exclusion of Standard Contractual Remedies</u>.  The franchise agreement purports to make its parsimonious refund provisions the exclusive remedy for CleanNet's failure to provide the promised customer accounts—meaning that Local Franchises cannot sue to obtain the benefit of their bargain.  For example, if CleanNet offered only $500 a month in customer accounts for a

1   full year to a Local Franchise that had purchased the $4,000-per-month package, the franchise

2   agreement would purport to limit the Local Franchise to the $11,550 refund mentioned above, and

3   would not permit it to recover the $42,000 difference between the accounts it paid for and those it

4   received.

5        45.   <u>Mandatory Releases</u>.  If the Local Franchise wishes to modify its package (whether

6   by increasing or decreasing its monthly billings), the franchise agreement requires the Local

7   Franchise to sign a global release of all potential claims against CleanNet and all persons and

8   entities associated with it, even if those claims are unknown to the Local Franchise.  By statute,

9   California generally prohibits such releases.

10  **F.    CLEANNET'S FRANCHISE AGREEMENT CONTAINS UNCONSCIONABLE
        DISPUTE RESOLUTION PROVISIONS**

11

12       46.   The Local Franchise has no effective way to enforce even the minimal remedies the

13  franchise agreement permits it.  In a section titled "Dispute Resolution" that spans four pages of

14  the contract, the franchise agreement imposes on the Local Franchise a complicated, onerous set of

15  procedures that are so expensive as to make it impossible for Local Franchises to recover their

16  potential refunds without paying far more in mediation and arbitration costs.  These

17  unconscionable dispute resolution provisions are part and parcel of CleanNet's scam.

18       47.   The franchise agreement requires that, in the event of a dispute, a Local Franchise

19  must first engage in direct negotiations with CleanNet.  If those negotiations fail, then within 180

20  days (when this time begins to run is unclear), the Local Franchise must submit to mediation

21  before the American Arbitration Association ("AAA"), and pay the AAA filing fee.  The Local

22  Franchise must then share equally with CleanNet the cost of the mediator's compensation and any

23  AAA administrative fees.  Since hourly mediator fees rival or exceed that of attorneys, even a one-

24  day mediation will often cost a Local Franchise thousands of dollars.  CleanNet can make this

25  significant outlay worthless simply by refusing to reach an agreement; mediation is not binding.

26       48.   If the mediation is unsuccessful, the franchise agreement requires the Local

27  Franchise to proceed by arbitration before AAA—again paying the initial filing fee (which starts

28

11.

at $775), and splitting the arbitrator's hourly fees and any other administrative costs evenly. Arbitrator rates are, again, equal to or greater than many attorney's fees. Moreover, AAA arbitrations generally involve briefing, witnesses, and document discovery—each of which will increase the amount of time required by the arbitrator, and so the cost. A Local Franchise's portion of these fees will often approach or exceed $10,000.

49. Thus, in order to get a binding, enforceable decision on a dispute with its Area Operator, a Local Franchise would have to pay tens of thousands of dollars in mediation and arbitration fees. And because the franchise agreement expressly provides for this distribution of costs, an arbitrator would likely lack the authority to reapportion costs at the close of the arbitration. This is to say nothing of the cost of the arbitration itself, such as depositions, service of process, photocopies, and the like—which can, again, run into the several thousands of dollars. A Local Franchise would thus spend substantially more getting a decision than it had spent on the franchise itself.

50. These dispute resolution provisions are made yet more unconscionable by the complexity of the franchise agreement, which makes representation by an attorney absolutely essential for a Local Franchise to have any hope of prevailing in arbitration; the strictly limited remedies available to Local Franchises under the terms of the franchise agreement, which would force a Local Franchise to pay more in attorneys' fees than it could hope to obtain in relief; and the absence of a prevailing party attorneys' fee provision in the body of the franchise agreement, which would make it extremely difficult for a Local Franchise to retain an attorney on contingency. By contrast, the promissory note that Local Franchises must sign in order to finance their franchise purchase does contain an attorneys' fee provision, but only in favor of CleanNet, and only if it seeks to enforce the terms of the promissory note. By statute, California prohibits such unilateral fee provisions and renders them bilateral. And, because the promissory note is an integrated part of the franchise agreement, Estrada, Carrazco, and Jacobo contend that the promissory note's attorneys' fee provision applies to the franchise agreement as a whole. However, how a court or arbitrator would rule on that issue is uncertain, and laypersons could not

1   be expected to be aware of these highly technical legal arguments.  Instead, they would be

2   dissuaded from retaining an attorney, and dissuaded from pursuing relief.

3         51.    The franchise agreement also purports to avoid litigation by class action, but not in

4   language that a layperson would understand.  Instead, it first indicates that claims can be

5   consolidated, and then obscurely rejects class action treatment.

6             Consolidation of Claims.  Where one or more other franchisees of Franchisor have

7   a dispute that is so nearly identical to a dispute involving Franchisee that
Franchisor, Franchisee, and the other franchisee or franchisees agree that it would

8   be prudent to have all of the disputes resolved in a single mediation or arbitration
proceeding, Franchisor, Franchisee, and the other franchisee or franchisees may

9   agree in writing to submit the consolidated disputes to mediation and/or arbitration
for determination by an arbitrator using the terms of this Article XXII.  Such

10   agreement shall only apply to Franchisee and any franchisees directly involved in
the consolidated proceedings, and, under no circumstances, shall the arbitrator have

11   the power to determine the legal rights or obligations of any person or party not
directly participating in the proceedings.

12   This provision, like the rest of the dispute resolution provisions in the franchise agreement, is

13   incomprehensible to the layperson, intended to obfuscate its purpose, and designed to prevent

14   Local Franchises from obtaining relief for CleanNet's misconduct.

15         52.    The end result of the franchise agreement's complicated, one-sided language is that

16   CleanNet sells purchasers of Local Franchises illusory promises of janitorial customer accounts

17   that are effectively rendered unenforceable by a series of onerous dispute resolution provisions.

18   The contract as a whole, and the dispute resolution provisions in particular, are offensive to basic

19   notions of justice, unconscionable, and unenforceable against the Local Franchises victimized by

20   CleanNet.

21   **G.    IN SUM, CLEANNET'S MODUS OPERANDI BREACHES A RANGE OF
CONTRACTUAL, COMMON LAW, AND STATUTORY DUTIES**

22

23         53.    CleanNet's modus operandi, implicit in how it runs its business, is to sell as many

24   Local Franchises as possible, as cost-effectively as possible, with callous disregard for the fate of

25   the individual franchisees who have bought into CleanNet's false promise of running a modest yet

26   viable business.  This callous disregard translates into CleanNet's shirking of its contractual

27   obligations—in part, because CleanNet puts unconscionable limits on its franchisees' remedies.

28

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

54.     CleanNet shirks not only its contractual obligations, but also its common law and statutory obligations.  CleanNet chooses to control nearly every aspect of the manner in which Local Franchises provide their janitorial services.  Indeed, the degree of control it chooses to exercise far exceeds that which is necessary for CleanNet to protect its brand name or intellectual property as a franchisor.  For instance, CleanNet's control extends to such areas as selecting which customers an individual franchisee will work with; setting the schedule for the individual franchisee's work; setting the tasks the individual franchisee must accomplish; setting the precise way in which the individual franchisee will accomplish those tasks; negotiating all customer contracts on the individual franchisee's behalf; setting the pricing for customer contracts provided to the individual franchisee; handling all customer interactions on behalf of the individual franchisee, including billing, collection, and fielding customer complaints; and reassigning customer contracts to other individual franchisees at CleanNet's discretion.  This degree of control demonstrates that CleanNet's supposed "franchisees" and "independent contractors" are actually employees under California law.

55.     CleanNet's choice to misclassify its employees as "franchisees" and "independent contractors" is deliberate.  It uses these misnomers to generate revenue both by selling Local Franchises and by using the labor of its employees to supply janitorial services—all the while eschewing its obligations to provide those employees with their basic entitlements, including their right to a minimum wage, overtime, wage statements and accurate records, indemnification for work-related expenses, only authorized deductions from their paychecks, and rest and meal periods.

## H.     ESTHER ESTRADA'S STORY

56.     Esther Estrada's experience is typical.  In July 2010, just a few days after being provided with unregistered and insufficient disclosures, she purchased a Local Franchise at the $1,000-per-month level and agreed to pay the $5,800 initial franchise fee.  She paid $3,200 down, and signed a promissory note for the $2,600 balance.  CleanNet provided her with between $1,033 and $1,233 in accounts, from which it deducted its 10% management fee, 3% royalty fee, and

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

promissory note payment—resulting in a net average payment to her of about $700 to $975 a month.

57.     In September 2012, having finally paid off the promissory note, Estrada upgraded her franchise to the $4,000-per-month level.  Once again, CleanNet provided only unregistered and insufficient disclosures, and did not provide Estrada with the required 14 days to review them. CleanNet forced her to sign the unenforceable waiver of claims and charged her an additional $10,700 initial franchise fee.  She paid $5,000 down, and signed a promissory note for the $5,700 balance.

58.     Once it had her additional investment, CleanNet never supplied Estrada anywhere close to the contracted-for level of customer accounts.  In October 2012, she received $1,233 in accounts; in November 2012, $2,303; in December 2012, $2,803.  In January 2013, by the end of which CleanNet was obligated to provide Estrada with $4,000 in customer accounts, she received only $2,433.  After that, Estrada's accounts steadily decreased, as CleanNet reported that customers had complained about the quality of her work—although she had done nothing differently than in the months during which they had been perfectly satisfied.  On at least one occasion, Estrada arrived at a job site to find another CleanNet Local Franchise already cleaning. When she inquired with the Area Operator, she was simply told the account had been reassigned.

59.     By October 2013, Estrada was averaging $1,400 per month in customer accounts. When she visited the Area Operator to complain about the situation, she was told—for the first time—that CleanNet had no obligation to provide her with customer accounts beyond the initial 180-day period.

60.     Even for the accounts that CleanNet did supply, Estrada did not have the control over her work that would indicate she was an independent contractor or a franchisee.  Instead, CleanNet treated Estrada like an employee, telling her which customers she could work with, negotiating the terms of the customer contracts on her behalf, setting the rate at which Estrada would be paid, and determining what work Estrada was required to do and when and how she was required to do it.  At the same time, CleanNet failed to meet its obligations as an employer,

15.

1  including by willfully misclassifying Estrada as something other than an employee; failing to pay

2  her the statutory minimum wage; failing to provide her with wage statements and records; failing

3  to indemnify her for her work-related expenses; making unlawful deductions from her paychecks;

4  forcing her to work overtime without due compensation; and denying her rest and meal periods.

5        61.    Unable to understand the franchise agreement as a whole or the complex dispute

6  resolution provisions, she sought out an attorney in January 2014. Because Estrada's franchise

7  investment totals $16,500, there is no plausible way for her to obtain a binding arbitration decision

8  without incurring more than that amount in mediation, arbitration, and attorneys' fees. Because of

9  the complexity of the agreement, Estrada is incapable of pursuing relief against CleanNet without

10  the aid of counsel.

11  **I.    ISAAC CARRAZCO'S STORY**

12        62.    Isaac Carrazco's experience was even worse than Estrada's, and shows how the

13  dispute resolution provisions of the Franchise Agreement effectively deny CleanNet franchisees a

14  remedy.

15        63.    In September 2012, Carrazco visited CleanNet's offices and was given its

16  unregistered and insufficient disclosures. Just a few days later, a CleanNet representative called

17  him and told him to come back immediately to sign the franchise agreement and to bring a

18  cashier's check. On September 7, 2012, Carrazco purchased a CleanNet franchise at the $4,000-

19  per-month level and agreed to pay the $16,200 franchise fee. He paid $10,700 down, and signed a

20  promissory note for the $5,500 balance. CleanNet did not provide Carrazco with a single account

21  until February 2012, five months after he signed the franchise agreement, when it finally offered

22  him a single $750 account. From this CleanNet deducted its 10% management fee, 3% royalty

23  fee, and monthly promissory note payment, resulting in a net payment to Carrazco of $560.50 for

24  the month.

25        64.    CleanNet offered that same meager account again in March 2012, and then

26  terminated it without cause at the end of the month. The next month, CleanNet provided Carrazco

27  with no accounts at all. When Carrazco visited the local Area Operator office and asked why he

28

EMERGENT
LEGAL

had not received the accounts he had purchased, he was told to give CleanNet a little more time find him some accounts. When the next month arrived and he again received no accounts, Carrazco visited the local Area Operator office and inquired again. This time, he was told that he would certainly receive the accounts he was promised or would be given his money back, but would have to return later, because the individual in charge of the Area Operator was not in the office. When Carrazco visited the Area Operator office a third time, the employee he had spoken to before was no longer there, and he was told that he was simply out of luck.

65. Even for the one account CleanNet did provide, Carrazco did not have the control over his work that would indicate he was an independent contractor or a franchisee. Instead, CleanNet treated Carrazco like an employee, telling him which customer he could work with, negotiating the terms of the customer contract on his behalf, setting the rate at which Carrazco would be paid, and determining what work he was required to do and when and how he was required to do it. At the same time, CleanNet failed to meet its obligations as an employer, including by willfully misclassifying Carrazco as something other than an employee; failing to pay him the statutory minimum wage; failing to provide him with wage statements and records; failing to indemnify him for his work-related expenses; making unlawful deductions from his paychecks; forcing him to work overtime without due compensation; and denying him rest and meal periods.

66. CleanNet's tactics in Carrazco's case were designed to take advantage of the dispute resolution provisions of the franchise agreement, and demonstrate why those provisions are part and parcel of the CleanNet scam. Because CleanNet had provided Carrazco with a single account worth $750, the franchise agreement limited his potential recovery to 60% of his initial investment, less the interest on his promissory note. And, by repeatedly telling Carrazco to give CleanNet some more time to meet its obligations, CleanNet pushed Carrazco beyond the ten-day windows when the franchise agreement permitted him to request a refund at all.

67. Unable to understand the franchise agreement as a whole or the complex dispute resolution provisions, Carrazco sought out an attorney in March 2014. Because Carrazco's franchise investment totals $16,200, there is no plausible way for him to obtain a binding

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

1  arbitration decision without incurring more than that amount in mediation, arbitration, and

2  attorneys' fees.  Because of the complexity of the agreement, Carrazco is incapable of pursuing

3  relief against CleanNet without the aid of counsel.

4  **J.      MARIA JACOBO'S STORY**

5          68.     Maria Jacobo's story demonstrates how, even when CleanNet eventually meets its

6  obligation to provide customer accounts, its profit-skimming, unconscionable fees, and

7  manipulation of customer relationships guarantee Local Franchises' failure.

8          69.     In mid-September 2012, Jacobo visited CleanNet of the Bay Area's office.  She

9  was given CleanNet's unregistered and insufficient disclosures, and told to come back another

10 time.  Just a few days later, a CleanNet representative called her and told her to come back in

11 immediately to sign the franchise agreement and to bring a cashier's check.  On September 19,

12 2012, Jacobo returned to the CleanNet office and signed the franchise agreement.  She purchased

13 the $4,000-per-month franchise package, paying $5,000 down and signing a promissory note for

14 the remaining $5,000 of the initial franchise fee.

15         70.     For the next two months, despite multiple inquiries from Jacobo, CleanNet did not

16 provide Jacobo with a single account.  Finally, in November 2012, CleanNet provided Jacobo with

17 a single account at $267 per month gross.  In February 2013, CleanNet added two accounts

18 totaling $715 per month gross; in May 2013, one more account at $325 per month gross; in June

19 2013, another account at $338 per month gross.  Not until July 2013, nine months after Jacobo

20 made her purchase, when CleanNet supplied another account at $2,500 per month gross, did the

21 company make good on its obligation to provide Jacobo with $4,000 per month in client accounts.

22 From all these CleanNet deducted the 10% management fee, 3% royalty fee, and monthly

23 promissory note payments.

24         71.     Jacobo also learned that CleanNet was charging its customers substantially more

25 than it was paying her to clean their buildings, even though CleanNet was supposedly negotiating

26 the customer contracts on her behalf and the customers ostensibly belonged to her.  For example,

27 during one visit to the CleanNet offices, Jacobo's husband saw firsthand CleanNet documents

28

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

indicating that the facility Jacobo was cleaning at a rate of $2,500 per month was being billed out to the customer at $7,500 per month.  CleanNet was thus skimming $5,000 per month off that account alone—and then charging Jacobo royalty and management fees off the remaining amount that she was paid.

72.     For each account that CleanNet supplied, Jacobo did not have the control over her work that would indicate she was an independent contractor or a franchisee.  Instead, CleanNet treated Jacobo like an employee, telling her which customers she could work with, negotiating the terms of the customer contracts on her behalf, setting the rate at which Jacobo would be paid, and determining what work she was required to do and when and how she was required to do it.  At the same time, CleanNet failed to meet its obligations as an employer, including by willfully misclassifying Jacobo as something other than an employee; failing to pay her the statutory minimum wage; failing to provide her with wage statements and records; failing to indemnify her for her work-related expenses; making unlawful deductions from her paychecks; forcing her to work overtime without due compensation; and denying her rest and meal periods.  When Jacobo raised concerns about the extent of work she was being required to do—which often caused her to work more than 11 hours per day, six days per week—she was told that any of her accounts could be reassigned by CleanNet at any time.

73.     Unable to understand the franchise agreement as a whole or the complex dispute resolution provisions, Jacobo sought out an attorney in March 2014.  Because Jacobo's franchise investment totals approximately $10,000, there is no plausible way for her to obtain a binding arbitration decision without incurring more than that amount in mediation, arbitration, and attorneys' fees.  Because of the complexity of the agreement, Jacobo is incapable of pursuing relief against CleanNet without the aid of counsel.

**K.      CLASS ALLEGATIONS**

74.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Estrada, Carrazco, and Jacobo bring this action on behalf of themselves and all other persons similarly situated.

///

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

75.     The proposed class (hereinafter the "Class") that Estrada, Carrazco, and Jacobo seek to represent is defined as follows:

> All persons who have purchased or owned a CleanNet local unit franchise within the State of California at any time during the period from four years prior to the filing of the original complaint in this action through the date of final judgment.

76.     This action may properly be maintained as a class action pursuant to Rule 23.

77.     On information and belief, the Class comprises hundreds of persons (the "Class Members"), making joinder of all Class Members impracticable.  The exact size of the Class and the identity of the Class Members are unknown to Estrada, Carrazco, and Jacobo, but are ascertainable from CleanNet's business records.

78.     Questions of law and fact common to the Class predominate over questions affecting only individual members, including, among others:

a.   Whether CleanNet has failed to provide registered and sufficient franchise disclosure documents and proposed franchise agreements 14 days prior to the sale of CleanNet franchises;

b.   Whether CleanNet has sold franchises by untrue and misleading statements and omissions;

c.   Whether CleanNet has breached the franchise agreements by failing to provide Estrada, Carrazco, Jacobo, and the Class Members with janitorial customer accounts totaling the minimum gross billings for the guaranteed six-month period;

d.   Whether CleanNet has unfairly interfered with Estrada, Carrazco, Jacobo, and the Class Members' right to receive the benefits of the franchise agreements by failing to ensure that it was able to provide sufficient janitorial customer accounts to all of its franchisees and terminating Estrada, Carrazco, Jacobo, and the Class Members' janitorial customer accounts without cause and on false pretenses, breaching the implied covenant of good faith and fair dealing,

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

interfering with Estrada, Carrazco, Jacobo, and the Class Members' prospective

economic advantage, and unjustly enriching CleanNet;

e.  Whether CleanNet has skimmed profits and charged its Local Franchises

unconscionable royalties and fees, unjustly enriching CleanNet and converting

Local Franchise funds;

f.  Whether CleanNet's degree of control over its Local Franchises makes them

employees;

g.  Whether CleanNet's failures to disclose, untrue and misleading statements and

omissions, contractual breaches, and other misconduct constitute unlawful,

unfair, and fraudulent business practices.

79.  The claims asserted by Estrada, Carrazco, and Jacobo in this action are typical of

the claims of the Class; the claims all arise from the same course of conduct by CleanNet; and the

relief sought is common.

80.  Estrada, Carrazco, and Jacobo are adequate representatives of the Class because

(a) their interests do not conflict with the interests of the individual members of the Class they

seek to represent; (b) they have retained experienced and competent class counsel; and (c) they

intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and

adequately protected by Estrada, Carrazco, and Jacobo and their counsel.

81.  A class action is superior to other methods for the fair and efficient adjudication of

this controversy.  Questions of law and fact common to the Class predominate over any questions

affecting only individual Class Members.  Each Class Member has suffered injury and is entitled

to recover by reason of CleanNet's unlawful conduct.  Class action treatment will allow those

similarly situated persons to litigate their claims in the manner that is most efficient and

economical for the parties and the judicial system.  In addition, because the economic damages

suffered by the individual Class Members may be relatively modest compared to the expense and

burden of individual litigation (though significant to each of them), it would be impracticable for

Class Members to seek redress individually.  Moreover, the prosecution of separate actions against

CleanNet by individual Class Members would create a risk of inconsistent judgments. Finally, there will be no undue difficulty in the management of this litigation as a class action.

**L.     PARTIES, JURISDICTION, AND VENUE**

82.     Plaintiff Esther Estrada is a resident of Hayward, California.

83.     Plaintiff Isaac Carrazco is a resident of Hayward, California.

84.     Plaintiff Maria Jacobo is a resident of Concord, California.

85.     On information and belief, defendant CleanNet USA, Inc. ("CleanNet USA") is a Virginia corporation with its principal place of business in Columbia, Maryland.

86.     On information and belief, defendant D&G Enterprises, Inc., doing business as CleanNet of the Bay Area, is a California corporation with its principal place of business in Oakland, California.

87.     On information and belief, defendant CleanNet of San Jose is a California corporation operating under a fictitious business name with its principal place of business in San Jose, California.

88.     On information and belief, defendant CleanNet of Southern California, Inc. is a California corporation with its principal place of business in Santa Fe Springs, California.

89.     On information and belief, defendant CleanNet of San Diego is a California corporation operating under a fictitious business name with its principal place of business in San Diego, California.

90.     On information and belief, defendant CleanNet of Sacramento is a California corporation operating under a fictitious business name with its principal place of business in Rancho Cordova, California.

91.     On information and belief, defendant Mark Salek is a resident of Columbia, Maryland.

92.     On information and belief, defendant Mark Crum is a resident of Oakland, California.

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

93.     On information and belief, all defendants are doing business as CleanNet, and are operating a single, integrated business of providing cleaning and janitorial services to commercial clients throughout the State of California; and CleanNet USA provides and sets the policies, forms, contracts, and marketing practices used by the other defendant entities.

94.     This Court has jurisdiction pursuant to section 1332(d) of Title 28 of the United States Code because this dispute is a class action in which the matter in controversy exceeds $5 million, and the named plaintiffs and Class Members are citizens of a state different from defendant CleanNet USA, which is incorporated in Virginia and has its principal place of business in Maryland.

95.     This Court is the proper venue for this dispute because defendants D&G Enterprises and CleanNet of San Jose have their principal places of business within this District; and because a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred within this District.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Failure to Provide Franchise Disclosure Document and Proposed Franchise Agreements**

**California Corporations Code Sections 31119, 31300 & 31302**

96.     Paragraphs 1 through 95 are incorporated by reference as if fully set forth herein.

97.     It is unlawful to sell any franchise subject to registration under the Franchise Law without first providing to a prospective franchisee, at least 14 days prior to the execution by the prospective franchisee of any binding franchise or other agreement, or at least 14 days prior to the receipt of any consideration, whichever occurs first, a copy of the franchise disclosure document, together with a copy of all proposed agreements relating to the sale of the franchise.

98.     CleanNet's franchises are subject to registration under the state's Franchise Law.

99.     CleanNet failed to provide Estrada, Carrazco, Jacobo, and the Class Members with registered and sufficient franchise disclosure documents and all proposed agreements relating to



CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

1   the sale of the franchise at least 14 days prior to the execution of the franchise agreements or

2   receipt of any consideration.

3         100.   CleanNet's failures to disclose were willful, because CleanNet knowingly and

4   intentionally failed to make the required disclosures.

5         101.   Estrada, Carrazco, Jacobo, and the Class Members have been harmed by

6   CleanNet's failures to disclose, because they would not have purchased CleanNet franchises,

7   would have purchased CleanNet franchises at lower billing levels, or would have taken steps to

8   otherwise protect themselves from CleanNet's overreaching had CleanNet made the required

9   disclosures and adhered to the required waiting period.

10         102.   Salek and Crum directly or indirectly control other CleanNet entities liable for the

11   above violations; or are partners, principal executive officers, or directors of those entities; or

12   occupy a similar status or perform similar functions; or are employees who materially aided the

13   acts constituting the above violations.  Salek and Crum had knowledge of (or reasonable grounds

14   to believe in) the facts by which the CleanNet entities are liable for these violations.

15         103.   CleanNet USA directly or indirectly controls other CleanNet entities liable for the

16   above violations, and had knowledge of (or reasonable grounds to believe in) the facts by which

17   the CleanNet entities are liable for these violations.

18   **SECOND CAUSE OF ACTION**

19   **Selling Franchises by Untrue and Misleading Statements and Omissions**

20   **California Corporations Code Sections 31201, 31301 & 31302**

21         104.   Paragraphs 1 through 103 are incorporated by reference as if fully set forth herein.

22         105.   It is unlawful to offer or sell any franchise in California by means of any written or

23   oral communication (other than an application, notice or report filed with the Commissioner of the

24   Department of Business Oversight) that includes an untrue statement of material fact or omits to

25   state a material fact necessary in order to make the statements made, in the light of the

26   circumstances under which they were made, not misleading.

27

28

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

106.    CleanNet made untrue and misleading oral statements to Estrada, Carrazco, Jacobo, and the Class Members by, among other things, (a) stating that CleanNet would provide the agreed minimum level of janitorial customer accounts, but failing to disclose that CleanNet lacked sufficient customer accounts to meet its obligations to all its franchisees; (b) stating that CleanNet would provide the agreed minimum level of janitorial customer accounts, but failing to disclose that CleanNet had terminated its franchisees' customer accounts without cause and on false pretenses; (c) describing CleanNet's operations, but failing to disclose that CleanNet had repeatedly been sued by its franchisees in the past; and (d) failing to provide accurate and up-to-date financial statements.

107.    Estrada, Carrazco, Jacobo, and the Class Members were not aware of these untruths and omissions.

108.    CleanNet was aware of these untruths and omissions, and did not exercise reasonable care in making these statements and omissions, because they concerned CleanNet's operations.

109.    Estrada, Carrazco, Jacobo, and the Class Members have been harmed by CleanNet's failures to disclose, because they would not have purchased CleanNet franchises, would have purchased CleanNet franchises at lower billing levels, or would have taken steps to otherwise protect themselves from CleanNet's overreaching, had CleanNet not made these untrue statements and omissions.

110.    Salek and Crum directly or indirectly control other CleanNet entities liable for the above violations; or are partners, principal executive officers, or directors of those entities; or occupy a similar status or perform similar functions; or are employees who materially aided the acts constituting the above violations.  Salek and Crum had knowledge of (or reasonable grounds to believe in) the facts by which the CleanNet entities are liable for these violations.

111.    CleanNet USA directly or indirectly controls other CleanNet entities liable for the above violations, and had knowledge of (or reasonable grounds to believe in) the facts by which the CleanNet entities are liable for these violations.

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

**THIRD CAUSE OF ACTION**

**Breach of Contract**

112.    Paragraphs 1 through 111 are incorporated by reference as if fully set forth herein.

113.    Estrada, Carrazco, Jacobo, and each of the Class Members entered into the franchise agreements, under which Estrada, Carrazco, Jacobo, and the Class Members agreed to (among other things) pay franchise and other fees.  In exchange, CleanNet agreed to provide Estrada, Carrazco, Jacobo, and the Class Members with (among other things) janitorial customer accounts totaling a minimum amount of gross billings per month for at least six months.  A true and correct copy of the franchise agreement is attached hereto as Exhibit A.

114.    Estrada, Carrazco, Jacobo, and the Class Members performed their duties under the franchise agreements.  There were no other conditions to CleanNet's performance.

115.    CleanNet breached the franchise agreements by failing to provide Estrada, Carrazco, Jacobo, and the Class Members with janitorial customer accounts totaling the minimum gross billings for the six-month period.

116.    Estrada, Carrazco, Jacobo, and the Class Members were harmed by CleanNet's breach, because Estrada, Carrazco, Jacobo, and the Class Members received less revenue than they were promised.

**FOURTH CAUSE OF ACTION**

**Breach of the Covenant of Good Faith and Fair Dealing**

117.    Paragraphs 1 through 116 are incorporated by reference as if fully set forth herein.

118.    Estrada, Carrazco, Jacobo, and each of the Class Members entered into the franchise agreements, under which Estrada, Carrazco, Jacobo, and the Class Members agreed to (among other things) pay franchise and other fees.  In exchange, CleanNet agreed to provide Estrada, Carrazco, Jacobo, and the Class Members with (among other things) janitorial customer accounts totaling a minimum amount of gross billings per month for at least six months.

119.    Estrada, Carrazco, Jacobo, and the Class Members performed their duties under the franchise agreements.  There were no other conditions to CleanNet's performance.

26.

120.    CleanNet breached the covenant of good faith and fair dealing by unfairly frustrating the purpose of the franchise agreements and undermining the reasonable expectations of Estrada, Carrazco, Jacobo, and the Class Members that they would be provided with the janitorial customer accounts and would not be deprived of these accounts by CleanNet beyond the six-month period so that they would be able to maintain a functioning franchise commensurate with their initial investment.

121.    CleanNet unfairly interfered with Estrada, Carrazco, Jacobo, and the Class Members' right to receive the benefits of the franchise agreements by failing to ensure that it was able to provide sufficient janitorial customer accounts to all of its Local Franchises, skimming profits off of customer contracts, and terminating Estrada, Carrazco, Jacobo, and the Class Members' janitorial customer accounts without cause and on false pretenses.

122.    Estrada, Carrazco, Jacobo, and the Class Members were harmed by CleanNet's conduct, because Estrada, Carrazco, Jacobo, and the Class Members received less revenue than they were promised, and received less revenue than they would have absent CleanNet's profit-skimming and termination of their janitorial customer accounts.

**FIFTH CAUSE OF ACTION**

**Intentional Interference with Prospective Economic Advantage**

123.    Paragraphs 1 through 122 are incorporated by reference as if fully set forth herein.

124.    Estrada, Carrazco, Jacobo, and the Class Members were in economic relationships with the customers for which they performed cleaning services that probably would have resulted in an economic benefit to Estrada, Carrazco, Jacobo, and the Class Members.

125.    CleanNet knew of the relationships between Estrada, Carrazco, Jacobo, and the Class Members and the customers of their janitorial services, because CleanNet established those relationships.

126.    CleanNet intended to disrupt or interfere with those relationships.

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

127.   CleanNet engaged in wrongful conduct by unjustly diminishing the economic benefits Estrada, Carrazco, Jacobo, and the Class Members received from their customer accounts, including by terminating accounts and skimming contract profits.

128.   The relationships between Estrada, Carrazco, Jacobo, and the Class Members and their customers were disrupted.

129.   Estrada, Carrazco, Jacobo, and the Class Members were harmed by CleanNet's conduct, because they received lower monthly revenues than they would have absent CleanNet's interference.

130.   CleanNet's wrongful conduct was a substantial factor in causing Estrada, Carrazco, Jacobo, and the Class Members' harm.

## SIXTH CAUSE OF ACTION

### Conversion

131.   Paragraphs 1 through 130 are incorporated by reference as if fully set forth herein.

132.   Estrada, Carrazco, Jacobo, and the Class Members had a right to possess all the funds paid out by CleanNet customers as compensation for Estrada, Carrazco, Jacobo, and the Class Members' janitorial services aside from those necessary to pay the contracted royalties and fees.

133.   CleanNet intentionally and substantially interfered with Estrada, Carrazco, Jacobo, and the Class Members' property by skimming contract profits and keeping those funds for itself.

134.   Estrada, Carrazco, Jacobo, and the Class Members did not consent to CleanNet keeping these funds for itself.  Estrada, Carrazco, Jacobo, and the Class Members were harmed by CleanNet's conduct, because they have been denied possession of their funds.  CleanNet's conduct was a substantial factor in causing this harm.

///

///

///

///

28.

1

**SEVENTH CAUSE OF ACTION**

2

**Money Had and Received**

3      135.    Paragraphs 1 through 134 are incorporated by reference as if fully set forth herein.

4      136.    When CleanNet customers paid CleanNet for the cleaning services performed by

5  Estrada, Carrazco, Jacobo, and the Class Members, CleanNet received money intended for

6  Estrada, Carrazco, Jacobo, and the Class Members.

7      137.    CleanNet has not paid Estrada, Carrazco, Jacobo, and the Class Members all of the

8  money intended for their benefit, because it has skimmed contract profits from their customer

9  accounts.

10

**EIGHTH CAUSE OF ACTION**

11

**Unjust Enrichment**

12      138.    Paragraphs 1 through 137 are incorporated by reference as if fully set forth herein.

13      139.    CleanNet received benefits from Estrada, Carrazco, Jacobo, and each of the Class

14  Members in the form of franchise and other fees.  CleanNet was aware that Estrada, Carrazco,

15  Jacobo, and the Class Members were providing these benefits, because it requested them and

16  received them directly.

17      140.    It would be unjust to permit CleanNet to retain the franchise and other fees paid by

18  Estrada, Carrazco, Jacobo, and the Class Members, because CleanNet failed to provide janitorial

19  customer accounts to Estrada, Carrazco, Jacobo, and the Class Members at the levels promised to

20  them or at levels sufficient to justify the fees paid by Estrada, Carrazco, Jacobo, and the Class

21  Members, and because CleanNet terminated Estrada, Carrazco, Jacobo, and the Class Members'

22  janitorial customer accounts without cause and on false pretenses.

23  ///

24  ///

25  ///

26  ///

27  ///

28



29.

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

## NINTH CAUSE OF ACTION

### Unlawful and Unfair Business Practices

### California Business & Professions Code Section 17200

141. Paragraphs 1 through 140 are incorporated by reference as if fully set forth herein.

142. Through the series of unlawful, unfair, and fraudulent acts described above, CleanNet has systematically deprived Estrada, Carrazco, Jacobo, and the Class Members of thousands of dollars each, without conferring on them the benefits promised in the franchise agreements.

143. Estrada, Carrazco, Jacobo, and the Class Members have been harmed by CleanNet's conduct, because they have received less revenue than they were promised, and less revenue than they would have absent CleanNet's misconduct.

### **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Esther Estrada, Isaac Carrazco, and Maria Jacobo, individually and on behalf of all others similarly situated, pray that:

A. CleanNet be ordered to return all funds received from Estrada, Carrazco, Jacobo, and the Class Members, in an amount to be determined at trial, but estimated to be in excess of $5 million;

B. CleanNet be ordered to pay compensatory damages in an amount to be determined at trial, but estimated to be in excess of $5 million;

C. CleanNet be enjoined to provide Estrada, Carrazco, Jacobo, and all Class Members with the minimum janitorial customer accounts guaranteed in the franchise agreements in an amount to be determined at trial, but estimated to be in excess of $5 million;

D. CleanNet be enjoined from violating California Corporations Code sections 31119 and 31201;

E. CleanNet be enjoined from pursuing its unlawful, unfair, and fraudulent business practices;

F. Estrada, Carrazco, Jacobo, and the Class Members recover their reasonable attorneys' fees;

G. Estrada, Carrazco, Jacobo, and the Class Members recover their costs of court;

H. Estrada, Carrazco, Jacobo, and the Class Members recover pre- and post-judgment interest; and

CLASS ACTION COMPLAINT: CASE NO. 3:14-cv-1785

1   I.   Estrada, Carrazco, Jacobo, and the Class Members be awarded such further relief as this Court deems just and proper.

2

3                              **<u>DEMAND FOR JURY TRIAL</u>**

4        Plaintiffs Esther Estrada, Isaac Carrazco, and Maria Jacobo, on behalf of themselves and

5   the Class Members, demand a jury trial on all issues triable to a jury in this matter.

6

7   Dated: April 17, 2014                    Respectfully submitted,

8                                            EMERGENT LEGAL

9

10

11                                           By: _____
                                                  Christopher Wimmer

12

13                                           BASIS LAW

14

15                                           By: _____
                                                  Greg Demirchyan

16

17                                           Attorneys for Plaintiffs ESTHER ESTRADA, ISAAC
                                             CARRAZCO, MARIA JACOBO, and all others
18                                           similarly situated

19

20

21

22

23

24

25

26

27

28

31.